ORDERED.

Dated:  August 16, 2021

_____
Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Gary Prifti and
Michele Prifti,

    Debtors.
_____/

Criswell Chevrolet, Inc.,

    Plaintiff,
vs.

Gary Prifti,

    Defendant.
_____/

Case No. 8:20-bk-07999-RCT
Chapter 7

Adv. No. 8:21-ap-00055-RCT

**MEMORANDUM DECISION AND ORDER
<u>DETERMING THAT DEBT IS DISCHARGEABLE</u>**

This proceeding came before the Court for trial on Plaintiff Criswell Chevrolet, Inc.'s ("Criswell") non-dischargeability complaint (Doc. 1).  Criswell sues to have its damages from the failed sale of a Corvette to Debtor-Defendant Gary Prifti ("Mr. Prifti") declared non-dischargeable under § 523(a)(2)(A) and (B) of the Bankruptcy Code.[1]  Criswell argues that Mr.

---

[1] 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code").  Criswell filed Proof of Claim No. 19 in the amount of

Prifti obtained the vehicle through false pretenses; specifically, by paying for and retaining the vehicle with checks he knew were bad. Mr. Prifti disagrees, asserting he did not fraudulently acquire or retain the Corvette because Criswell agreed to hold the first check while he came up with the required funds by selling another vehicle– something he ultimately failed to do.

Prior to trial, the parties submitted a joint stipulation of facts (Doc. 17) and Criswell filed a memorandum of law in support of its complaint (Doc. 18). Having considered the arguments, evidence, and testimony presented, the Court makes the following findings of facts and conclusions of law.

**Findings of Fact**

Criswell is a Chevrolet car dealership located in Gaithersburg, Maryland.[2] Debtor Gary Prifti is a car enthusiast residing in Bradenton, Florida. In the summer of 2019, Mr. Prifti owned a Mustang GT 350 but was looking upgrade to a new Corvette.

Mr. Prifti found the Criswell dealership online and contacted Michael Furman, a Criswell employee who handled internet sales. Mr. Furman found a Corvette for Mr. Prifti and told him that it would be ready in two months. Mr. Prifti put down a $1,000 deposit and waited.

On September 24, 2019, Mr. Prifti traveled to Maryland and signed a "Vehicle Buyer's Order" to purchase the Corvette from Criswell.[3] At the dealership, Mr. Prifti worked with another Criswell salesman, Steven Krantz, to consummate the sale. After applying a $3,000 rebate and the $1,000 deposit, the balance due for the Corvette was $77,719.62.[4] Mr. Prifti presented a personal out of state check dated September 9, 2019 for the full purchase price (the

---

$13,198.68, which represents the price Mr. Prifti agreed to pay for the new Corvette, less the sales price of the car to a third party as a pre-owned vehicle and other cost-saving deductions applied by Criswell.
[2] Doc. 17 ¶ 1.
[3] Criswell's Ex. 1.
[4] Doc. 17 ¶ 4; Criswell's Ex. 1.

2

"First Check").[5]  It is unclear if Criswell ran a credit check at the point of sale.

Mr. Prifti then took possession of and title to the Corvette from the dealership in Maryland and drove it to his home in Florida.[6]  When Mr. Prifti drove the car off the lot, the odometer on the Corvette showed 5 miles.[7]  Mr. Prifti testified that before he took possession of the car, he told Mr. Krantz that he was still trying to sell his Mustang.  Mr. Prifti was assured that he would have a least 10 days to make good on the check, and he believed he could do so by completing a pending contract for the sale of the Mustang and another car.  Mr. Krantz did not testify and thus could not contradict Mr. Prifti's testimony.  Per Mr. Prifti, the Mustang contract was for $75,000 and Ford had a $50,000 lien on it.  Accordingly, to make the math work, Mr. Prifti would have also had to sell his second car or obtain financing.  His testimony concerning the pending sale of the second car, another Corvette, was vague and less persuasive than the sale of the Mustang.

Predictably, the First Check bounced.[8]  Michael Cohen, the Finance Director for Criswell and self-proclaimed "debt collector" contacted Mr. Prifti about the bounced check.  Mr. Prifti explained that the sale of his Mustang and other car fell through.  Mr. Prifti offered that he might be able to tap into his retirement funds if the taxes were not too much of issue.  He also said that he would return the car.

Mr. Cohen urged him to write another check and to hold onto the car, at least temporarily.  He indicated that Criswell would explore opportunities to finance the vehicle and that Mr. Prifti should not send the car back just yet.  Mr. Prifti then wrote a second check for the purchase price dated November 4, 2019 (the "Second Check").[9]

---

[5] Criswell's Ex. 2.
[6] Doc. 17 ¶ 5.
[7] Doc. 17 ¶ 3.
[8] Criswell's Ex. 2.
[9] Criswell's Ex. 3.

When the Second Check bounced, and all but one financial institution denied financing,[10] Mr. Cohen demanded the return of the vehicle.  Mr. Prifti complied.  He paid for and shipped the car back to Criswell on a trailer.  It was delivered safely to the dealership on December 26, 2019.[11]  When the car was returned, it had approximately 1,614 miles on the odometer.[12]  But, even after the car was returned to Criswell, Mr. Krantz continued to try to obtain financing for Mr. Prifti to no avail.[13]  Thereafter, Criswell resold the Corvette for $62,000.

Defendant filed a Chapter 7 bankruptcy petition on October 27, 2020.[14]  Criswell filed a timely adversary proceeding seeking to have its damages from the failed sale of the vehicle declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and (B).

## Conclusions of Law

Creditors bear the burden of proof of establishing exceptions to discharge under § 523 by a preponderance of the evidence.[15]  Courts narrowly construe exceptions to discharge to allow the "honest but unfortunate debtor" to receive their statutorily prescribed fresh start.[16]  Accordingly, if a court determines a debt is non-dischargeable the reasons "must be real and substantial, not merely technical and conjectural."[17]  "[I]f there is room for an inference of honest intent, the question of non-dischargeability must be resolved in favor of the debtor."[18]

---

[10] Although no institution would finance the full purchase price, U.S. Bank offered a loan of $45,000.  Prifti's Ex. 2 at 8.
[11] Doc. 17 ¶ 6.
[12] Doc. 17 ¶ 7.
[13] Prifti's Ex. 1.
[14] Case No. 8:20-bk-07999-RCT, Doc. 1.
[15] *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)); *see also J. Thompson Invs., LLC v. Soderstrom (In re Soderstrom)*, 524 B.R. 835 (Bankr. M.D. Fla. 2015).
[16] *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1477 (11th Cir.1985); *see also Caspers v. Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) ("[E]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code.").
[17] *Miller*, 39 F.3d at 304; *see also Fiandola v. Moore (In re Moore)*, 508 B.R. 488, 494 (Bankr. M.D. Fla. 2014), *aff'd*, 619 F. App'x 951 (11th Cir. 2015) (stating "like objections to discharge, exceptions to the dischargeability of a particular debt are also strictly construed in favor of the debtor").
[18] *Gaft v. Sheidler (In re Sheidler)*, No. 15-8011, 2016 WL 1179268, *5 (6th Cir. BAP Mar. 28, 2016).

Section 523(a)(2) bars fraud-based debts from discharge.[19] Its twin subparagraphs are mutually exclusive.[20] Subparagraph (A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's … financial condition."[21] On the other hand, Subparagraph (B) excepts from discharge debts obtained by a materially false written "statement … respecting the debtor's … financial condition."[22]

### (1) Section 523(a)(2)(A)

As the Eleventh Circuit explained, Courts "have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud."[23] In other words, the creditor must prove:

> (1) the debtor made a false representation to deceive the creditor,
> (2) the creditor relied on the misrepresentation,
> (3) the reliance was justified, and
> (4) the creditor sustained a loss as a result of the misrepresentation.[24]

There is a split of authority on whether giving a check can be a representation under § 523(a)(2)(A),[25] but in any event, the representation must be accompanied by an intent to deceive.[26] To prove intent to deceive, the debtor "must be guilty of positive fraud[] or fraud in fact."[27] Evaluating whether a debtor has the requisite intent to deceive is a fact-based inquiry based, in part, on the debtor's credibility and demeanor.[28] Because fraudulent intent typically is

---

[19] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758 (2018).
[20] *Harris v. Jayo (In re Harris)*, 3 F.4th 1339, 1347 n. 4 (11th Cir. 2021).
[21] 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge any debt: (1) for money, property … or an extension … of credit, to the extent obtained by (2) … false pretenses, a false representation, or actual fraud, (3) other than a statement respecting the debtor's … financial condition.
[22] 11 U.S.C. § 523(a)(2)(B).
[23] *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir.1998).
[24] *Id.*
[25] *See Designed Flooring Distrib., Inc. v. Wagenti (In re Wagenti)*, 110 B.R. 602 (Bankr. S.D. Fla. 1990); *Southeast Bank, N.A. v. Hunter (In re Hunter)*, 83 B.R. 803 (M.D. Fla 1988).
[26] *They Might Be, Inc. v. Carter (In re Carter)*, 593 B.R. 354, 361 (Bankr. M.D. Fla. 2018)
[27] *Id.* (quoting *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986) (abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279 (1991)).
[28] *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

not admitted, courts look to the totality of the circumstances.[29]

Turning to the facts of this case, first, the Court finds that the dealership knew that Mr. Prifti did not have the money to cover the check when it was delivered. Criswell's witnesses Michael Cohen and Kevin Szot simply could not rebut Mr. Prifti's testimony about the discussions he had with Criswell salesmen Michael Furman and Steven Krantz.

Second, the Court finds it is possible that when Mr. Prifti wrote the First Check in September 2019, he could have stretched his finances to pay for the Corvette if he really wanted to. He plainly had a nice Mustang that could net at least $25,000. He probably could have borrowed at least $45,000 with the Corvette as collateral. Similarly, as Mr. Krantz suggested, he could have cajoled his wife into co-signing a loan.[30] And, he had some retirement funds, although the record does not reflect how much. Criswell never demonstrated that Mr. Prifti could not pay, just that the check bounced.

Third, Mr. Prifti was off-base if he really thought he could cover the check in the 10 days that Criswell's salesmen allowed him. But he was probably right that he could get a little more time for financing if he needed it. That is almost a given based on this record.

In short, Criswell failed to prove that Mr. Prifti intended a fraud. Indeed, the evidence more than suggests that once the Mustang sale fell through, Mr. Prifti determined that it did not make sense to tap out all his resources for a car he did not need. So, he carefully packed up and returned the Corvette, notwithstanding Criswell's continued attempts to find financing for him. His decision not to pay for the car plainly was a breach of contract giving rise to damages. But it has not been proven to be a fraud.

Accordingly, the Court does not find that Criswell has satisfied its burden of proving Mr.

---

[29] *Id.*
[30] Prifti's Ex. 1 at 2.

Prifti's intent to deceive and will deny Criswell's claim under § 523(a)(2)(A).

### (2) Section 523(a)(2)(B)

To establish a non-dischargeability claim under § 523(a)(2)(B), the creditor must show the debt was obtained by the (1) use of a statement in writing:

>   (2) respecting the debtor's financial condition,
>   (3) that is materially false,
>   (4) made with an intent to deceive,
>   (5) on which the creditor reasonably relied.[31]

Whether a check is ever a "statement respecting the debtor's financial condition" under § 523(a)(2)(B) is an interesting issue, but not one that is necessary for the Court to answer here. Having already determined that Criswell did not prove intent to deceive, Criswell's claim under § 523(a)(2)(B) fails as well.

Finally, as an aside, Criswell also failed to prove its reliance on the First Check was justified (as to § 523(a)(2)(A)) or reasonable (as to § 523(a)(2)(B)). Mr. Prifti presented a predated personal check on an out of state bank account. Criswell plainly knew that Mr. Prifti was driving the car back to his home in Florida. It is inconceivable to the Court that they reasonably or justifiably relied on this check. At best, Criswell's salesmen made a calculated risk that if Mr. Prifti could afford the Mustang, he could afford the Corvette. Fortunately for Criswell, it was not that bad a risk. If the sale had been to someone who did not take care to return the vehicle unharmed, the damages could have been much worse.

Accordingly, Criswell has not established its non-dischargeability claim under either § 523(a)(2)(A) or (B). As such, Mr. Prifti's debt to Criswell, as reflected by Criswell's Proof of Claim No. 19, is subject to discharge. A separate judgment will be entered in favor of Mr. Prifti.

---

[31] 11 U.S.C. § 523(a)(2)(B).

It is so **ORDERED**.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).